UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LEONARD. D. DUBOFF,

       Plaintiff,

    v.

PLAYBOY ENTERPRISES
INTERNATIONAL, INC., a Delaware
Corporation and MICHAEL GROSS, an
Individual,

       Defendants.

Civil No. 06-358-HA

OPINION AND ORDER

HAGGERTY, Chief Judge:

    Plaintiff Leonard DuBoff (DuBoff or plaintiff) asserts claims for libel, false light, and intentional infliction of emotional distress (IIED) against defendants Playboy Enterprises International, Inc. (Playboy) and Michael Gross (Gross), stemming from an article in *Playboy*

Page - 1   OPINION AND ORDER

magazine's February 2006 issue.  On April 3, 2006, defendants filed a Special Motion to Strike (ORS 31.150) and Alternative Motion for Summary Judgment [5].  On July 19, 2006, the court granted plaintiff's Motion to Disqualify Counsel, finding that defendants' counsel, Davis Wright Tremaine (DWT), had previously represented plaintiff in a matter substantially related to the current action. *See* Order Granting Motion to Disqualify issued July 31, 2006 (hereinafter 7/31/06 Order).

At the outset, plaintiff challenges defendants' Special Motion to Strike [5], on the grounds that DWT prepared the motion and related briefing.  Plaintiff argues that since DWT was disqualified from representing defendants in this matter, the court should strike defendants' Special Motion to Strike [5].  The court's prior order disqualifying DWT found that "in deference to the applicable standards, the representation DWT provided to the plaintiff in *Ainslie* must be construed as substantially related and as giving rise to the existence of significant doubt and at least an appearance of impropriety." 7/31/06 Order at 3.  It does not follow, however, that the court should strike the motion and briefing prepared by DWT simply because DWT was subsequently disqualified.  There is no evidence that DWT's prior representation of plaintiff informed the motion currently before the court, or that this motion has any relation to client information or confidences.  By retaining new counsel, any possible conflict or actual conflict has been segregated and entirely removed from this case.  Requiring defendants' new counsel to effectively file the same motion, supporting memoranda, and declarations already filed would be both duplicative and an inefficient use of judicial resources.  Accordingly, plaintiff's Motion to Strike Defendants' Special Motion to Strike [34] is denied.

For the reasons stated below, defendants' Special Motion to Strike and Alternative

Motion for Summary Judgment [5] is granted.

**FACTUAL BACKGROUND**

This case arises from *Playboy* magazine's publication of an article entitled "The Taking of Sex.com," published in its February 2006 issue (hereinafter, the Article). The Article, authored by Gross, describes the litigation surrounding the ownership of the "sex.com" domain name. In the Article, Gross explains the extensive litigation between Gary Kremen (Kremen), who had originally registered "sex.com," and Stephen Cohen (Cohen), who later fraudulently had the domain name transferred to himself. The litigation established that domain names are property, subject to the protections of property law, including claims for conversion. The Article describes this litigation as "the greatest duel ever fought" in the realm of Internet law.

The Article provides a detailed background of numerous individuals, including Stephen Cohen. Cohen is described as a convicted felon and lifelong criminal, engaging in check-kiting schemes, stealing cars, and forgery, among other frauds. The Articles states that at one time Cohen possessed five passports and three drivers' licenses, that he falsely told various individuals that he worked with the CIA, that he had graduated from West Point, and that he was a member of the California Bar. Cohen was eventually convicted of bankruptcy fraud and obstruction of justice and was sentenced to forty-six months in federal prison, from which he was released in February 1995.

According to the Article, Cohen stole the "sex.com" domain name in 1995 by creating forged documents and telling the domain register that the actual owner, Kremen, was no longer interested in retaining the domain name. In 1996, Cohen transferred the license for sex.com to a new company he set up in the British Virgin Islands, naming a fictional person as the chairman

Page - 3   OPINION AND ORDER

of that company.

In 1998, DuBoff began representing Cohen in litigation concerning the use of the "sex.com" domain name. Cohen filed numerous copyright infringement suits against individuals and companies that used the word "sex" in their domain name. The Article mentions DuBoff in two places. First, DuBoff is mentioned in a description of Cohen stealing legal documents from a Kinko's where they were being copied, by representing himself as an attorney for the opposing party. The Article quotes the reaction of Robert Dorband and describes Dorband as an attorney working for DuBoff. The other mention of DuBoff in the Article is in the following statements:

> By that time, Sex.com was making a fortune, so much that Cohen was able to hire one of the best-known trademark attorneys in the country, Leonard DuBoff, a disgraced academic with a shady past. (DuBoff declined to talk to *Playboy*, calling questions about his past insulting.)

Pl. First. Am. Comp. ¶ 8. Plaintiff alleges that the statements that he was a disgraced academic, that he had a shady past, and that he declined to talk to *Playboy* are each false and defamatory and place him in a false light. Pl. First Am. Comp. ¶ 10.

In researching and fact-gathering for the Article, Gross interviewed more than a dozen lawyers, both inside and outside the sex.com litigation. During the course of researching the Article, Gross obtained information relating to DuBoff, including documents detailing DuBoff's resignation from a tenured professorship at Lewis & Clark Law School. These documents, described below, are attached as Exhibits 1-8 to the Declaration of Michael Gross (Gross Decl.).

Exhibit 1 is a June 18, 1985 letter from Dean Arthur LaFrance to plaintiff. This letter discusses the need for plaintiff to report on his outside employment, with approval required by the President of Lewis & Clark.

Exhibit 2 is an April 6, 1992 memorandum from Kris Olson, Associate Dean of Lewis &

Clark Law School to Stephen Kanter, Dean of Lewis & Clark Law School. This memorandum advises Dean Kanter about plagiarism concerns and pending securities litigation in which DuBoff was alleged to have illegally sold securities and participated in fraudulent transactions.

Exhibit 3 is an April 8, 1992, memorandum from Lewis & Clark student Heidi Brown to DuBoff. Brown asks DuBoff to promptly return her work.

Exhibit 4 is an October 5, 1993, memorandum from acting Dean James Huffman to Michael Mooney, President of Lewis & Clark. This memorandum advises the President that despite DuBoff's representation that he was practicing law only one day a week, he was in fact engaged in substantially more legal practice and was in partnership for six years, in contravention of ABA accreditation standards and contrary to his own assertions. Dean Huffman explains that "it is now apparent that the Law School reaccreditation was based in part upon the blatantly false claims of Professor DuBoff. This is surely dishonestly violative of the Law School's Principles of Employment and Tenure." This memorandum also discusses plagiarism concerns and a civil judgment and pending civil proceedings and concludes that "there is sufficient evidence to believe that Professor DuBoff is guilty of dishonesty and neglect of duty, both grounds for termination...."

Exhibit 5 is an October 8, 1993 memorandum from Associate Dean Olson to Dean Huffman. This memorandum advises Dean Huffman of Associate Dean Olson's interviews with DuBoff's former legal partners and associates, each of whom confirmed that plaintiff DuBoff practiced law greatly in excess of one day per week. It also describes plagiarism allegations made by attorney Jeffrey Babener against DuBoff. It reports that DuBoff told a law associate that he had to use the title of "of counsel" because he would otherwise lose his fulltime

professorship under ABA rules. That associate also reported that DuBoff's testimony in a recent securities fraud case was a "bold-faced lie."

Exhibit 6 is a an October 19, 1993, letter from attorney Harry Chandler, of Stoel Rives, to President Mooney. This letter details the evidence and charges against DuBoff. Chandler advises that "to have that professor engaged in what appear to be serious incidents of plagiarism, not only of a law partner's works but also of a student's work, would reasonably have a negative impact upon the credibility of the law school with students." It also states that "to have a professor involved in securities law violations and potential federal and state RICO violations also raises questions of the competence of that individual to teach in those areas." The letter concludes:

> there appears to be more than sufficient evidence of incompetence, neglect, and dishonesty to justify initiating tenure termination proceedings. Dishonesty is reflected in the academic setting, as constituting academic dishonesty. Professor DuBoff's conduct also constitutes commercial plagiarism, since he gained profit from the use of Heidi Brown's and Jeff Babener's works. Dishonesty is also established in DuBoff's communications with the College regarding the degree of his commitment to his law practice.... Incompetence and negligence are reflected in the pending litigation against DuBoff.

Exhibit 7 is a December 16, 1993, letter from Jane Atkinson, Lewis & Clark Professor, to President Mooney. Professor Atkinson is Chair of the Advisory Committee that examined whether formal proceedings should be instituted regarding DuBoff. This letter states that the Committee found that "DuBoff deliberately violated the Law School's policy concerning the practice of law and lied about the extent and nature of his practice to the Dean of the Law School." Further, the letter states, "there is strong evidence that he repeatedly violated the conditions stated in his employment contract with the College." The letter concluded, "it is our unanimous recommendation that

Page - 6   OPINION AND ORDER

formal proceedings be instituted to consider dismissal of Professor DuBoff."

Exhibit 8 is a December 30, 1993 letter from attorney Charles Hinkle, of Stoel Rives, to President Mooney. This letter and the attached agreement detail the terms and conditions of DuBoff's separation from Lewis & Clark.

After obtaining these documents, Gross attempted to interview DuBoff to follow up on the information he had gathered. After leaving two voicemails for DuBoff that were unreturned, Gross sent him an email on September 6, 2005 requesting an opportunity to talk about the sex.com litigation. Plaintiff responded by email on September 7, 2005 indicating his preference to communicate only via email.

> On that same day, Gross responded with the following email to plaintiff:
>
> Thrilled to hear from you. My first question is hopefully an easy one. How did Stephen Michael Cohen come to be a client of yours? Bob Dorband said he didn't know. The curiosity, of course, is how Cohen came to hire an Oregon firm. I assume it had something to do with your TM expertise! And what if anything do you recall of your first encounters?

Gross Decl., Ex. 9. DuBoff responded:

> I do not know how Cohen came to hire us either and discussions between an attorney and client are privileged. Unless you can obtain Mr. Cohen's permission to disclose that meeting, I am not ethically permitted to discuss it.
>
> Sincerely,
> Leonard DuBoff

Gross Decl., Ex. 9. Gross followed-up with more questions:

> Mr. DuBoff, Thanks for the reply. When I next speak to Stephen Cohen I will ask for the permission you mention below. My only other pressing questions (for now, at least) have to do with you, so I assume privilege does not apply to them. Would you care to comment on an allegation made to me that you were building a bomb at the time of the explosion that blinded you? And would you care to comment on the circumstances that led to your departure circa 1993-4 from your tenured position at Lewis & Clark? I can, of course, be more specific, but in the

Page - 7   OPINION AND ORDER

>interest of brevity will assume you already know of the matters to which I refer. Sincerely, Michael Gross.

Gross Decl., Ex. 9. DuBoff replied:

>Mr. Gross:
>
>Your questions are insulting and therefore I will not even honor them with a reply.
>
>Sincerely,
>
>Leonard DuBoff

Gross Decl., Ex. 9. Gross replied:

>Mr. DuBoff, Checking information told to me by others is the responsible and honorable thing to do. I am simply doing my job and I am sorry that you are disinclined to understand that. I urge you to reconsider, so that your point of view is included. Should you, upon reflection, decide to re-open this conversation, I will be happy to hear from you. If not, I will note your reaction should there ultimately be any references to you in my story.
>
>Respectfully,
>
>MGross

Gross Decl., Ex. 9. DuBoff sent a final reply:

>Dear Mr. Gross:
>
>As I told you I am extremely busy and your last questions were improper and obviously intended to be inflammatory. If you wish accurate information, you may wish to check the Oregon State Bar Bulletin's June issue. You can check this by going to the Oregon State Bar's website, clicking on Bar Publications under the Membership Services section, then choose Bar Bulletin, go to the Bar Archives, click on the June 2005 issue, then to the Profiles in the Law under Features. That should provide you with all of the accurate information you need. Anything else you print will be either malicious or with a gross disregard for the truth.
>
>Leonard DuBoff

Gross Decl., Ex. 9.

Page - 8   OPINION AND ORDER

After the Article was published in February 2006, plaintiff filed a lawsuit alleging claims for libel, false light, and IIED. Plaintiff denies any inference that he has engaged in plagiarism, violations of his teaching contract, dishonesty with respect to the law school, violations of accreditation standards, or was involved in securities fraud schemes. Pl. Resp. to Def.'s Concise Statement of Material Facts ¶ 2. Plaintiff claims that he was blinded because of a laboratory accident and not as a result of building a bomb. *Id.* at ¶ 3. Upon hearing Gross' questions alleging that he had been building a bomb at the time of the accident that blinded him, he alleges that he broke out in a sweat and became nauseous. He alleges that he subsequently sought psychiatric care and continues to suffer anxiety because of the question. *Id.* at ¶ 11. In opposing defendants' Motion to Strike, plaintiff includes various affidavits to refute the statement that plaintiff "was a disgraced academic with a shady past."

## STANDARDS

O.R.S. 31.150-31.155 comprise Oregon's "Anti-SLAPP" statutes. "Anti-SLAPP" stands for "Anti-Strategic Lawsuit Against Public Participation." *Metabolife Int'l Inc. v. Wornick*, 264 F.3d 832, 837 n.7 (9th Cir. 2001). The purpose of similar statutes has been described as the "protection of individuals from meritless, harassing lawsuits whose purpose is to chill protected expression." *Id.* Under these statutes, a defendant may make a special motion to strike against a claim in a civil action that arises out of:

> (a) Any oral statement made, or written statement or other document submitted, in a legislative, executive, or judicial proceeding or other proceeding authorized by law;
>
> (b) Any oral statement made, or written statement or other document submitted, in connection with an issue under consideration or review by a legislative, executive or judicial body or other proceeding authorized by law;

>(c) Any oral statement made, or written statement or other document presented, in a place open to the public or a public forum in connection with an issue of public interest; or

>(d) Any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue of an issue of public interest.

O.R.S. 31.150(2).

When determining whether to grant a motion to strike, "the court shall consider pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." O.R.S. 31.150(4).

Defendants in federal court may avail themselves of the Anti-SLAPP statute provisions. *Englert v. MacDonell*, Civil No. 05-1863-AA, 2006 WL 1310498, *7 (D. Or. May 10, 2006); *Gardner v. Martino*, Civil No. 05-769-HU, 2005 WL 3465349, *3 (D. Or. Sept. 19, 2005); see also *Thomas v. Fry's Elec., Inc.*, 400 F.3d 1206, 1206-07 (9th Cir. 2005).

To succeed on the motion, defendants must first make a *prima facie* showing that the claims to which the motion is directed arise out of one of the categories of civil actions described in O.R.S. 31.150(2). *See* O.R.S. 31.150(3). Then, the burden shifts to plaintiff to show a probability that he will prevail on his defamation claim by presenting substantial evidence to support a *prima facie* case. *Id.* If plaintiff fails to meet this burden, the court must grant the motion and enter a judgment of dismissal without prejudice. O.R.S. 31.150(1).

## **DISCUSSION**

Defendants argue that plaintiff's claim should be stricken pursuant to O.R.S. 31.150 because (1) plaintiff's claims arise out of conduct described in the statute, and (2) plaintiff cannot establish with substantial evidence a probability that he will prevail on his claims.

1.      **Defendants' Burden**

To succeed on the motion, defendants must first make a *prima facie* showing that the claims to which the motion is directed arise out of one of the categories of civil actions described in O.R.S. 31.150(2). Defendants argue that plaintiff's claims arise out of defendants' "conduct in furtherance of the exercise of the constitutional right of . . . free speech in connection with a public issue or an issue of public interest." O.R.S. 31.150(2)(d).

A.      **In Furtherance of a Constitutional Right**

Defendants argue that researching, authoring and publishing the magazine article in question constitutes conduct in furtherance of the exercise of the constitutional right of free speech. Plaintiff does not appear to seriously contend that defendants were not exercising their constitutional free speech rights.

Plaintiff's claims for libel and false light arise from two sentences in the Article, published in *Playboy* magazine. As described above, the Article discussed the theft of the domain name sex.com and the resulting litigation. The writing and publishing of a magazine article is conduct in furtherance of the exercise of free speech rights under the anti-SLAPP statute. *See Gardner*, 2005 WL 3465349 at *5, citing *Thale v. Business Journal Pubs., Inc.*, Mult. Co. Case No. 0402-02160 (granting the defendant's motion under O.R.S. 31.150 arising from claims for libel and false light based on statements published in a *Business Journal* article).

Plaintiff's third claim, for IIED, arises from questions Gross posed in an email asking plaintiff to comment on an allegation communicated to Gross during his research for the Article. Researching and fact-gathering for the purpose of publishing an article involving a matter of

public interest constitutes conduct in furtherance of the exercise of free speech. *Lieberman v. KCOP Television, Inc.*, 1 Cal. Rptr. 3d 536, 542 (Cal. App. 2003) (newsgathering constitutes conduct undertaken in furtherance of the media's right to free speech).

### B. Public Issue/Issue of Public Interest

Defendants posit that both the subject of the Article generally and the decision to hire plaintiff that was made by the Article's key subject, Cohen, were related to "an issue of public interest" within the meaning of O.R.S. 31.150(2)(d). Plaintiff responds that the specific statements in the Article about DuBoff are based on events not connected to a matter of public interest, and therefore Oregon's Anti-SLAPP statute is inapplicable to plaintiff's claims.

No Oregon appellate courts have interpreted "an issue of public interest" as referenced in O.R.S. 31.150(2)(d), nor does the statute itself define the term. The term has been applied broadly, however, in Oregon state and federal cases.

In *Card v. Pipes*, 398 F. Supp. 2d 1126 (D. Or. 2004), the plaintiff brought a claim for defamation based on statements published in a newspaper and later on an Internet website stating that he had made anti-Israel statements in the classroom. The court held that plaintiff's claims were subject to the defendants' Anti-SLAPP motion to strike. *Card*, 398 F. Supp. 2d at 1136 ("[p]laintiff's claims arise out of written statements presented in a place open to the public or public forum (website, newspaper) in connection with an interest of public concern (alleged political activism and bias in the college classroom.)").

Similarly, in *Gardner,* the court dismissed the plaintiff's claim for false light, defamation, intentional interference with economic relations, and intentional infliction with prospective economic advantage, pursuant to O.R.S. 31.150. The court held that the statements at issue –

comments on a national talk-radio show about a single consumer's dealings with an Oregon retailer – constituted statements about a public issue or an issue of public concern. *Gardner*, 2005 WL 3465349 at *7. In arriving at its conclusion, the *Gardner* court noted that state trial courts in Oregon have similarly interpreted "issue of public interest" broadly. The *Gardner* court referred to *Thale*, *supra* (applying the Anti-SLAPP statute to claims arising from statements published in an article about the plaintiff's resignation from InFocus Corporation and some of the business decisions the plaintiff made while employed there) and *Kurdock v. Electro Scientific Indus., Inc.,* Mult. Co. Case No. 0406–05889 (concluding that statements made by employer to other employees and shareholders concerning plaintiff's termination are statements made on "an issue of public interest"). The court further stated:

> Just as persuasive are the California decisions, interpreting California's analogous anti-SLAPP statute, which have broadly interpreted the "public issue" or "public interest" standard. *E.g. Traditional Cat Ass'n, Inc. v. Gilbreath*, 13 Cal. Rptr. 3d 353, 356 (Cal. Appl. 2004) (statements concerning a dispute among different factions of cat breeders were matters of public interest for purposes of anti-SLAPP statute because they "concerned matters of public interest in the cat breeding community"); [*Seelig v. Infinity Broad. Corp.*, 119 Cal.Rptr.2d 108, 115 (Cal. App. 2002)] (discussion on radio talk show regarding participant on television program called "Who Wants to Marry a Millionaire" was subject to anti-SLAPP statute because the subject of the radio discussion, a television show featuring "the sort of person willing to meet and marry a complete stranger on national television," fell within the statutory criterion of "an issue of public interest.").

*Gardner*, 2005 WL 3465349 at *5.

More recently, in *Englert v. MacDonell*, 2006 WL 1310498, the court held that comments made by a group of forensic scientists, in connection with an ethics complaint against a fellow forensic scientist, satisfied the "issue of public interest" requirement of Oregon's Anti-SLAPP statute. *Id.* at *8. The court noted that while *Thale*, *Gardner*, and *Card* all involved

Page - 13   OPINION AND ORDER

publication by the media, and were therefore factually distinguishable, the statements at issue in *Englert* "encourage[d] investigation of ethics violations which improve the professional standards, particularly where courtroom experts are concerned." *Id.*

Here, plaintiff insists that the court must only consider whether the one statement challenged by plaintiff concerns an issue of public interest. This argument is misplaced. The plain language of the statute reads that defendants may move to strike a claim that arises out of "conduct in furtherance of the exercise of the… constitutional right of free speech *in connection* with an issue of public interest." O.R.S. 31.150(2)(d) (emphasis added). The conduct at issue here is researching, writing, and publishing the Article. Plaintiff does not contend that the controversy surrounding Cohen's theft of the domain name is not a matter of public interest. Therefore, adopting the broad definition of public interest applied by other Oregon state and federal courts, there is no doubt that the statement here was made in connection with an issue of public interest, specifically, the sex.com litigation and related events.

    2.    **Plaintiff's Burden**

Once defendants have met their initial burden, the burden shifts to plaintiff to establish that there is a probability that he will prevail on his claims by presenting substantial evidence to support a *prima facie* case of these claims. O.R.S. 31.150(3). "[T]he plaintiff cannot simply rely on the allegations in the complaint . . . but must provide the court with sufficient evidence to permit the court to determine whether there is a probability that the plaintiff will prevail on the claim." *Gardner*, 2005 WL 3465349 at * 8 (citing *ComputerXpress, Inc. v. Jackson*, 113 Cal. Rptr. 2d 625, 641 (Cal. App .2001)).

    A.    **Libel Claim**

Plaintiff alleges that his libel claim arises solely from the following statements: "By that time, Sex.com was making a fortune, so much that Cohen was able to hire one of the best-known trademark attorneys in the country, Leonard DuBoff, a disgraced academic with a shady past. (DuBoff declined to talk to Playboy, calling questions about his past insulting)." Pl. First. Am. Comp., ¶¶ 6, 8. Plaintiff alleges that the statement that he was "a disgraced academic with a shady past" is actionable because it is false and defamatory.

Defendants contend that plaintiff cannot sustain their burden of establishing a *prima facie* case on the libel claim because the challenged statement is nonactionable opinion. For the reasons provided below, this court agrees.

Whether a statement is capable of a defamatory meaning is a question for the court. *Reesman v. Highfill*, 965 P.2d 1030, 1034 (Or. 1998). When deciding whether a statement is capable of a defamatory meaning, the court must look to "the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation." *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995).

To be actionable, a statement must be not only defamatory, but also false. *Reesman,* 965 P.2d at 1033. Therefore, statements of opinion are generally not actionable. *Gardner*, 2005 WL 3465349 at * 8 (citing *Reesman*, 965 P.2d at 1035). "[S]tatements of opinion are protected by the First Amendment unless they 'imply a false assertion of fact.'" *Standing Comm. on Discipline v. Yagman*, 55 F.3d 1430, 1438 (9th Cir. 1995) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990)). Three factors determine whether a statement implies an assertion of objective facts: (1) the use of figurative or hyperbolic language negating the impression that the speaker was seriously maintaining the content of the statement; (2) whether the general tenor of

the statement in context negates that impression; and (3) whether the statement can be proven true or false. *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990).

Here, plaintiff's defamation claim fails because the phrases "disgraced academic" and "shady past" are not actionable. Plaintiff cannot show that the statements are "no more than rhetorical hyperbole," "parody," or "loose" or "figurative" speech, which is not actionable. *Milkovich*, 497 U.S. at 16-17; *see also Yagman*, 55 F.3d at 1438 ("[S]tatements of rhetorical hyberbole aren't sanctionable, nor are statements that use language in a loose, figurative sense.") (internal quotations omitted). The Ninth Circuit has held that the term "shady" is "not the kind of factual expression for which the Constitution permits liability to be imposed." *Lewis v. Time, Inc.*, 710 F.2d 549, 554 (9th Cir. 1983). Although *Lewis* was decided before *Milkovich*, the Ninth Circuit has reaffirmed its holding that the phrase "shady practitioner" is protected speech. *Yagman*, 55 F.3d at 1440; *see also Arista Records, Inc. v. Flea World, Inc.*, 356 F. Supp. 2d 411, 425 (D. N.J. 2005) (holding, post-*Milkovich*, that the phrase "shady vendor" is rhetorical hyperbole). The phrase "disgraced academic" is similarly hyperbolic opinion. *See Yagman*, 55 F.3d at 1440-41 (the statement that a judge was "dishonest" did "not imply facts capable of objective verification" and therefore was "constitutionally immune from sanctions.").

Because plaintiff cannot prove that the statement that he was "a disgraced academic with a shady past" is an actionable defamatory statement, the court strikes plaintiff's libel claim.

### B.  False Light Claim

Plaintiff's false light claim arises from the same statements as the libel claim. Therefore, the same First Amendment defenses apply. *See Cort v. St. Paul Fire & Marine Ins. Cos., Inc.*, 311 F.3d 979, 987 (9th Cir. 2002) ("When an invasion of privacy claim rests on the same

allegations as the claim for defamation, the former cannot be maintained as a separate claim if the latter fails as a matter of law") (internal citation omitted); *Partington v. Bugliosi*, 56 F.3d 1147, 1160 (9th Cir. 1995) ("we reject Partington's false light claims regarding the two contested statements … for the same reason that we rejected his defamation claims based on those statements: both statements are protected by the First Amendment, regardless of the form of tort alleged"). Accordingly, this court strikes plaintiff's false light claim for the same reasons as the libel claim, discussed above.

        C.        **Intentional Infliction of Emotional Distress Claim**

Plaintiff's IIED claim stems from the email communications between Gross and plaintiff, on or around September 7, 2005. Plaintiff argues that Gross' email asking plaintiff if he would "care to comment on an allegation made to me that you were building a bomb at the time of the explosion that blinded you" was sufficiently outrageous as to establish a claim for IIED.

O.R.S. 131.150 applies to "any claim in a civil action that arises out of" conduct to which the statute applies. This court has previously dismissed a claim for IIED pursuant to O.R.S. 131.150. *See Card*, 398 F. Supp. 2d at 1136-37. Here, plaintiff's IIED claim arises out of conduct in furtherance of the defendants' exercise of their right to free speech in connection with an issue of public interest. Gross' email was conduct in the course of fact-gathering for the Article, and therefore plaintiff's IIED claim stemming from that email is subject to the Anti-SLAPP statute.

A claim for IIED requires proof that (1) defendants' acts were so extreme and outrageous that they constituted an extraordinary transgression of the bounds of socially tolerable conduct; (2) defendants intended to inflict severe emotional distress on plaintiff; and (3) defendants' acts

Page - 17   OPINION AND ORDER

caused plaintiff severe emotional distress.  *Babick v. Or. Arena Corp.*, 40 P.3d 1059, 1063 (Or. 2002).

Plaintiff has not presented substantial evidence to support a *prima facie* case for IIED. First, plaintiff presents no evidence that Gross intended to inflict severe emotional distress on the plaintiff, a necessary element for an IIED claim.  Further, posing a question to plaintiff over email does not constitute an "extraordinary transgression of the bounds of socially tolerable conduct." *Id.*  Gross first asked if plaintiff would be willing to answer questions regarding the sex.com litigation.  Plaintiff requested that such communication be via email.  Complying with plaintiff's request, Gross began with questions regarding plaintiff's relationship with Cohen. After plaintiff explained that such information was privileged, Gross posed the question found to be offensive by plaintiff.  After plaintiff refused to answer, Gross responded that "[c]hecking information told to me by others is the responsible and honorable thing to do.  I am simply doing my job and I am sorry that you are disinclined to understand that.  I urge you to reconsider, so that your point of view is included." Gross Decl., Ex. 9.  Gross' conduct was well within the sphere of legitimate newsgathering, and does not rise to the level of outrageousness or socially intolerable conduct required to make a *prima facie* case of IIED.

Plaintiff has failed to present substantial evidence to support a *prima facie* case for his libel, false light, and IIED claims.  Accordingly, defendants' Special Motion to Strike [5] is granted.

## CONCLUSION

Because the court finds that plaintiff's claims should be stricken pursuant to O.R.S. 131.150, *et seq.*, the court need not reach whether defendants are entitled to summary judgment

on plaintiff's claim for IIED. Based on the foregoing, plaintiff's Motion to Strike Defendants' Special Motion to Strike [34] is DENIED and defendants' Special Motion to Strike [5] is GRANTED. Accordingly, this case is DISMISSED.

    IT IS SO ORDERED.

        DATED this  26  day of June, 2007.

                                              /s/ Ancer L. Haggerty  
                                                Ancer L. Haggerty  
                                          United States District Judge